

AO 91 (REV.5/85) Criminal Complaint                    AUSA Jason A. Yonan, (312) 353-4156

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA                    MAGISTRATE JUDGE MASON

**FILED**

v.                                          **CRIMINAL COMPLAINT**

6-14-11

JUN 1 4 2011

JOSE LOPEZ                                  **CASE NUMBER:**

MICHAEL W. DOBBINS    **UNDER SEAL**    **11 CR    410**
CLERK, U.S. DISTRICT COURT

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief: From on or about April 23, 2010, to on or about April 24, 2010, at Cicero, in the Northern District of Illinois, Eastern Division, JOSE LOPEZ, defendant herein:

did knowingly and unlawfully seize, confine, kidnap, and hold for ransom a person, namely Minor A, and did use a means, facility, and instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense, namely, pay phones operated on the interstate network of AT&T, a telephone service provider;

in violation of Title 18, United States Code, Sections 1201(a)(1) and 2. I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

_____
Signature of Complainant
NANETTE DOORLEY
Special Agent, Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

June 14, 2011                              at  Chicago, Illinois
Date                                           City and State

_____          _____
MICHAEL T. MASON, U.S. Magistrate Judge
Name & Title of Judicial Officer               Signature of Judicial Officer

UNITED STATES DISTRICT COURT    )
                                          ) ss
NORTHERN DISTRICT OF ILLINOIS    )

## AFFIDAVIT

I, NANETTE DOORLEY, being duly sworn, state as follows:

## AGENT BACKGROUND AND PURPOSE OF AFFIDAVIT

1.      I am a Special Agent with the Federal Bureau of Investigation and have been so employed for fifteen years. My current responsibilities include the investigation of violent crimes, including, among others, kidnapping, bank robbery, and the apprehension of violent fugitives.

2.      This affidavit is submitted in support of a criminal complaint alleging that JOSE LOPEZ violated Title 18, United States Code, Sections 1201(a)(1) and 2. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging LOPEZ with kidnapping, I have not included each and every fact known to me concerning this investigation.

3.      The information in this Affidavit is based on interviews of witnesses, my own observations and actions, information received from other law enforcement agents, my experience and training, and the experience of other agents. References to recorded conversations are based in part on my review of draft transcripts that have been translated from Spanish into English.[1]

---

[1] The transcripts are preliminary and are not intended to be final transcripts.

## **BACKGROUND OF KIDNAPPING**

4.        At approximately 8:50 a.m. on April 23, 2010, a fifteen-year-old boy (hereinafter referred to as "Minor A") was kidnapped in Cicero, Illinois while on his way to school. According to Minor A, while he was walking to school, two unknown males forced him into a black Ford Expedition, placed a jacket over his head, and took him to an unknown location, where he was kept in a basement. On April 24, 2010, at approximately 7:00 p.m., Minor A's captors released him unharmed.

5.        During the time that Minor A was kidnapped, a total of eleven ransom calls were made to Minor A's father, hereinafter referred to as Individual A. These calls were made to Individual A's cellular telephone from pay phones located in various areas of Chicago. The FBI and other law enforcement agencies were able to record approximately six of the ransom calls. During the investigation, the FBI determined through a search of phone records that the pay phones from which the ransom calls were made operate on the interstate network of AT&T, a telephone service provider.

6.        According to Individual A, he received the first ransom call at approximately 4:06 p.m. on April 23, 2010. During this call, the caller told Individual A, in Spanish, that Minor A had been kidnapped and that the kidnappers wanted $450,000 on April 24, 2010, for Minor A's safe return. The caller said that he would call back on April 24, 2010, to arrange the location to which he wanted the $450,000 delivered. According to phone records obtained for Individual A's phone, this call was made from a pay phone

2

located at 1926 W. 35th Street in Chicago, Illinois. There were ten additional ransom calls after this initial call.

## INFORMATION PROVIDED BY CO-CONSPIRATOR A

7.      On September 14, 2010, the FBI arrested an individual hereinafter referred to as Co-Conspirator A in connection with the kidnapping. Following his arrest, Co-Conspirator A admitted being involved in Minor A's kidnapping and ransom demands. Co-Conspirator A is cooperating with the government in hopes of receiving a reduced sentence in his case. No promises have been made to Co-Conspirator A regarding the government's sentencing recommendation.[2]

### Phone numbers of the individuals involved

8.      Co-Conspirator A has stated that an individual named JOSE LOPEZ and an individual hereinafter referred to as Co-Conspirator B were involved in Minor A's kidnapping. Co-Conspirator A has provided to the FBI the phone numbers he used to communicate with LOPEZ and Co-Conspirator B during the time period relevant to the kidnapping. According to C-Conspirator A, he communicated with LOPEZ at two numbers, (708) XXX-7643 ("**LOPEZ Phone 1**") and (773) XXX-6227 (**"LOPEZ Phone 2"**). Co-Conspirator A stated that he communicated with Co-Conspirator B at phone number (773) XXX-4481.

---

[2] Co-Conspirator A's criminal history includes convictions for possession of cocaine, aggravated battery/great bodily harm, and illegal possession of a firearm.

3

9.      During the investigation, I obtained subscriber and call detail records for all three of the numbers listed in paragraph 8 from Sprint Nextel, the service provider for each number. The subscriber information shows that during the time period relevant to this case:

a.      **LOPEZ Phone 1** was assigned to JOSE LOPEZ, with a subscriber address in Chicago, Illinois.

b.      **LOPEZ Phone 2** was assigned to Gustavo Hernandez, with a subscriber address of P.O. Box 54988, Irvine, California 92619. Based on my training and experience, and the training and experience of other agents, I am aware that the Irvine, California address is the default address for a prepaid phone operated on Sprint Nextel's network. I am also aware, based on my training and experience and the training and experience of other agents, that individuals involved in criminal activity sometimes provide a false name when purchasing and/or registering a prepaid phone in an attempt to avoid detection by law enforcement.

c.      Phone number (773) XXX-4481 was assigned to Co-Conspirator B, with a subscriber address in Maywood, Illinois.

10.     During the investigation, I conducted interviews with an individual hereinafter referred to as Individual B. Individual B is LOPEZ's brother-in-law. According to Individual B, during the time period relevant to this case, he communicated with LOPEZ on two different phone numbers. Individual B could not, however, remember both phone

4

numbers. Individual B provided me with his own phone number during one interview. I then examined call detail records for **LOPEZ Phone 1** and **LOPEZ Phone 2** to determine if the records show calls to or from Individual B's phone number. My review of the call detail records for **LOPEZ Phone 1** and **LOPEZ Phone 2** show, in April 2010, incoming and outgoing calls to or from Individual B's phone and both of Lopez's phones.

### Planning the kidnapping

11.     According to Co-Conspirator A, he met LOPEZ in or about November 2009, when they began working for the same employer. Co-Conspirator A stated that in early April 2010, LOPEZ asked Individual B something along the lines of whether he wanted to grab someone, which Co-Conspirator A knew to mean kidnap someone. Co-Conspirator A responded that he did not. Over the course of the next few days, Co-Conspirator A stated that LOPEZ continued to ask him whether he wanted to kidnap someone, and also asked Co-Conspirator A if he knew anyone else who would be interested. According to Co-Conspirator A, at some point he told LOPEZ that Co-Conspirator B might be interested in doing a kidnapping. According to Co-Conspirator A, he first met Co-Conspirator B in October 2009 when the two were in an Illinois Department of Corrections boot camp, and they had stayed in touch when they were both released.

12.     Thereafter, Co-Conspirator A said that he planned to take LOPEZ to meet Co-Conspirator B at Co-Conspirator B's home in Maywood, Illinois. Co-Conspirator A stated that on a date in early April 2010, LOPEZ came to Co-Conspirator A's house in the

morning for them to go visit Co-Conspirator B. According to Co-Conspirator A, he called Co-Conspirator B to let him know that they were coming. Co-Conspirator A stated that, as he was calling Co-Conspirator B, the battery on his phone started dying, so he used LOPEZ's phone to call Co-Conspirator B. Co-Conspirator A was not able to contact Co-Conspirator B at that time and he and LOPEZ did not go to Co-Conspirator B's home at that time. As a result of Co-Conspirator A using LOPEZ's phone, however, Co-Conspirator A stated that LOPEZ obtained Co-Conspirator B's phone number because the calls would have been stored in the memory of LOPEZ's phone.

13.     I have reviewed Co-Conspirator B's phone records obtained from Sprint Nextel. Those records show that the first call between Co-Conspirator B's phone and either of the two numbers linked to LOPEZ took place on April 9, 2010. According to the records, on April 9, 2010, at approximately 6:52 a.m., there were two calls to Co-Conspirator B's phone from Co-Conspirator A's phone, one call with a duration of two seconds and the other call with a duration of three seconds. Shortly thereafter, at approximately 7:18 a.m. on April 9, 2010, the phone records reflect three calls to Co-Conspirator B's phone from **LOPEZ Phone 2**, each with a duration of 5 seconds or less. Following those two calls, at approximately 7:20 a.m. on April 9, 2010, the records reflect additional calls to Co-Conspirator B's phone from Co-Conspirator A's phone.

14.     On April 10, 2010, starting at approximately 9:09 a.m. and ending at approximately 9:48 a.m., Co-Conspirator B's phone records reflect eight calls to Co-

6

Conspirator B's phone from Co-Conspirator A's phone. Thereafter, starting at approximately 10:01 a.m. and ending at approximately 10:04 a.m., the records reflect four calls to Co-Conspirator B's phone from both of LOPEZ's phones.

15.     Co-Conspirator A stated that one morning after he initially attempted to call Co-Conspirator B, LOPEZ picked Co-Conspirator A up from his house and drove him to pick up Co-Conspirator B at Co-Conspirator B's home in Maywood, Illinois. Co-Conspirator A stated that LOPEZ was driving a black Ford Expedition or Excursion. According to Co-Conspirator A, at this time he had not yet spoken to Co-Conspirator B about the kidnapping. Co-Conspirator A believes that LOPEZ must have contacted Co-Conspirator B separately using Co-Conspirator B's number stored in LOPEZ's phone. Co-Conspirator B's phone records show numerous calls to or from LOPEZ's two phones after April 9, 2010.

16.     Co-Conspirator A stated that after he and LOPEZ picked up Co-Conspirator B at his home in Maywood, they drove to the vicinity of Minor A's home in Cicero, Illinois. At that time, Co-Conspirator A said that they saw Minor A walking to school with another boy. LOPEZ then stated that they were going to kidnap Minor A, but they did not because Co-Conspirator A became nervous about taking part in the kidnapping. Later, Co-Conspirator A, LOPEZ and Co-Conspirator B went to a restaurant. At the restaurant, they discussed the kidnapping, and LOPEZ told Co-Conspirator B that Co-Conspirator B would receive $25,000 for the kidnapping.

7

**Kidnapping and subsequent ransom calls**

17.     According to Co-Conspirator A, he was not involved with the kidnapping of Minor A on April 23, 2010. Instead, Co-Conspirator A's first involvement was a ransom call he made to Individual A in the evening on April 23, 2010.

18.     Individual A did, in fact, receive a ransom call at approximately 9:58 p.m. on April 23, 2010. Records show that the ransom call was made from a gas station located at 3142 W. North Avenue, Chicago, Illinois. Co-Conspirator A has stated that he made this ransom call to Individual A. According to Co-Conspirator A, LOPEZ called him in the evening on April 23, 2010, and told Co-Conspirator A to make a ransom call to a number that LOPEZ provided to Co-Conspirator A. Co-Conspirator A said that LOPEZ told Co-Conspirator A what to say on the ransom call. According to Co-Conspirator A, he used his phone to dial the number LOPEZ provided to him so that he could store the number in his phone and access the number when he needed it. Co-Conspirator A stated that he drove to a gas station and made the ransom call as LOPEZ directed.

19.     Co-Conspirator A's phone records show a two second call from Co-Conspirator A's phone to **LOPEZ Phone 1** at 9:14 p.m. on April 23, 2010, followed by a 181 second call from **LOPEZ Phone 1** to Co-Conspirator A's phone thirty seconds later. Following this call, at approximately 9:37 p.m. on April 23, 2010, Co-Conspirator A's phone records show a zero second call to Individual A.

8

20.     Co-Conspirator A's phone records further show a call from Co-Conspirator A's phone to **LOPEZ Phone 1** at 9:51 p.m. on April 23, 2010. In addition, Co-Conspirator A's phone records show calls to or from **LOPEZ Phone 2** at 9:52 p.m. and 9:54 p.m. on April 23, 2010, shortly before the 9:58 ransom call that Co-Conspirator A made to Individual A.

21.     According to Co-Conspirator A, on Saturday morning, April 24, 2010, LOPEZ called him to further discuss the kidnapping. LOPEZ told Co-Conspirator A that Co-Conspirator A knew too much and that Co-Conspirator A had to continue to help with the kidnapping. LOPEZ told Co-Conspirator A to pick LOPEZ up at a work site. LOPEZ also directed Co-Conspirator A to make another ransom call to Individual A. According to Co-Conspirator A, LOPEZ told Co-Conspirator A what to say on this ransom call. Co-Conspirator A said that he drove and made the ransom call prior to picking Lopez up. Co-Conspirator A drove a red Mitsubishi car that Co-Conspirator A's brother owned.

22.     Co-Conspirator A's phone records show that Co-Conspirator A received calls from **LOPEZ Phone 2** on Saturday, April 24, 2010, at approximately 9:10 a.m. and 9:52 a.m. The phone records further show that Co-Conspirator A called **LOPEZ Phone 2** at 10:26 a.m. and again at approximately 10:40 a.m. Individual A received a ransom call at approximately 10:39 a.m. on April 24, 2010, from a pay phone located at 2801 W. Armitage in Chicago, Illinois.

23.     Co-Conspirator A stated that during the above mentioned ransom call, Individual A asked to speak to his son. Law enforcement recorded this ransom call and I have read a draft transcript of the recording translated from Spanish to English. During the call, Individual A can be heard telling Co-Conspirator A that Individual A wanted to speak with his son.

24.     According to Co-Conspirator A, following this call, Co-Conspirator A told LOPEZ that Individual A wanted to speak to his son. LOPEZ then directed Co-Conspirator A to drive LOPEZ to the south side of Chicago, around an area Co-Conspirator A believes to be near a J.J. Fish restaurant at 51st Street and Ashland Avenue. At that time, Co-Conspirator A said that he parked his brother's car in an alley and that he and LOPEZ went into a house through a back door. Co-Conspirator A stated that the back door led into the kitchen of the house, and that he and LOPEZ went directly downstairs into the basement of the house from the kitchen. In the basement, Co-Conspirator A said that he saw Minor A sitting on a couch. Co-Conspirator A also saw two individuals sitting with their faces covered, one of whom he recognized to be Co-Conspirator B. Co-Conspirator A stated that he did not recognize the other individual.

25.     According to Co-Conspirator A, while in the basement, Co-Conspirator B took a new cellular phone out of its box, activated the phone, and gave the phone to Co-Conspirator A to make a ransom call to Individual A. During the call, Individual A was allowed to speak with Minor A. Minor A has also confirmed that shortly

10

before this call was made, something was placed over his head and additional individuals entered the basement where he was being held. Minor A stated that he heard a phone being removed from a box and activated, and that he was then allowed to speak with his father.

26.    Phone records show that this ransom call was made at approximately 12:59 p.m., from a cell phone using number (708) XXX-5408, purportedly subscribed to by an individual living in Broadview, Illinois.[3]    The FBI determined that Cricket Communications is the service provider for this phone (hereinafter the "Cricket phone").

27.    Co-Conspirator A stated that within minutes of the call to Individual A described in paragraph 26 above, he and LOPEZ left the house and drove to a J.J. Fish restaurant a short distance away at 51st Street and Ashland Avenue in Chicago. Co-Conspirator A said that he made a ransom call to Individual A from a pay phone at that location. Records show that Individual A did, in fact, receive a ransom call at approximately 1:08 p.m. from a pay phone located at 5101 S. Ashland Avenue in Chicago, Illinois. Moreover, Co-Conspirator B's phone records show that at 1:09 p.m., immediately after the 1:08 p.m. ransom call, Co-Conspirator A used his phone to make an outgoing call to Co-Conspirator B.

28.    After that ransom call, Co-Conspirator A stated that he and LOPEZ drove around and made ransom calls at various other areas in Chicago, mostly on the north side. Co-Conspirator A stated that LOPEZ told Co-Conspirator A what to say on the calls.

---

[3] The FBI has been unable to locate the individual to whom this phone was registered. In addition, the address in Broadview to which this phone was registered does not appear to be a valid address.

11

## ANALYSIS OF PHONES

### Phone calls between the individuals involved

29.     My review of the phone records for Co-Conspirator A, Co-Conspirator B, and LOPEZ for the time period when the kidnapping took place on April 23, 2010, to the day after Minor A was released on April 25, 2010, shows numerous calls among the phone numbers for these individuals.

### Cricket phone

30.     Pursuant to a Court order entered by Magistrate Judge Maria Valdez, the FBI obtained, among other things, historical cell site data for the Cricket phone used to make the 12:59 p.m. ransom call noted in paragraph 26 above.[4] The cell site data reflects the cell tower and antenna face used at the start and end of the ransom call at the specified time period. Based on my training and experience, I know that law enforcement officers can use historical cell site information to analyze the past use of a cellular phone and thereby obtain information about a subject's whereabouts, activities, and patterns of behavior.

31.     The cell site records show that the cell tower used for this call was located at 805 W. 58th Street in Chicago, Illinois. As a result, the FBI has determined that Minor A was held somewhere in the vicinity of this cell tower on Chicago's south side.

_____

[4] Phone records for the Cricket phone show only two other calls from this phone, both of which appear to have been used to activate the phone.

**Co-Conspirator B's phone**

32.　　　As noted above, the kidnapping in this case took place at approximately 8:50 a.m. on April 23, 2010. A review of Co-Conspirator B's phone records shows that on April 23, 2010, from approximately 6:22 a.m. to 6:53 a.m., Co-Conspirator B's phone called **LOPEZ Phone 1** four times, and received one call from that number. Moreover, the records show a call from **LOPEZ Phone 2** to Co-Conspirator B's phone at approximately 7:06 a.m. The records show two additional calls between Co-Conspirator B's phone and **LOPEZ Phone 1** at 9:43 a.m., approximately an hour after the kidnapping took place.

33.　　　Pursuant to a Court order entered by Chief Judge James F. Holderman, the FBI obtained historical cell site data for Co-Conspirator B's phone for the time period April 21, 2010, to April 25, 2010. FBI Special Agent Joseph Raschke has conducted a preliminary analysis of the cell site records from Co-Conspirator B's phone. Specifically, Special Agent Raschke has determined the cell towers that Co-Conspirator B's phone used during the time period of the kidnapping and ransom in this case.

34.　　　Co-Conspirator B's phone records show that his phone was used at 7:54 a.m. and 7:55 a.m. on April 23, 2010. Each of those calls used a cell tower in Cicero, Illinois, located at approximately Cermak Street and Lombard Avenue. This cell tower is the closest tower to the kidnapping location.

35.     Co-Conspirator B's phone records show that the next call from his phone was made at approximately 9:09 a.m., approximately twenty minutes after the kidnapping. The cell tower used for that call is in Chicago, and appears to show Co-Conspirator B's phone traveling southeast as compared to the location of the 7:55 a.m. call noted in paragraph 34 above.[5]

36.     Co-Conspirator B's phone records show that he used his cell phone ten times between 12:54 p.m. and 1:12 p.m. on April 24, 2010, around the time that the 12:59 p.m. ransom call was made to Individual A from the basement of the location where Minor A was being held. As noted above, Co-Conspirator A stated that Co-Conspirator B was at the ransom location at the time of the call.

37.     Co-Conspirator B's cell site records show that during this time period, Co-Conspirator B's phone used cell towers located at approximately 58th Street and Ada Street and 59th Street and Francisco Avenue in Chicago. This is an area on Chicago's south side. The cell tower at 58th Street and Ada Street is approximately one-half mile west of the tower at 805 W. 58th Street that the Cricket phone used for the ransom call from the basement of the location where Minor A was being held. The tower at 59th Street and Francisco is approximately two and one-half miles west of the tower at 805 W. 58th Street.

---

[5]  As noted above in paragraph 9, subscriber records indicate that Co-Conspirator B lives in Maywood, Illinois. Co-Conspirator A has also explained that when he and LOPEZ went to pick up Co-Conspirator B, they went to Co-Conspirator B's home in Maywood, Illinois.

**LOPEZ's phones**

38.     Pursuant to a Court order entered by Chief Judge James F. Holderman, the FBI obtained historical cell site data for LOPEZ's phones for the time period April 21, 2010 to April 25, 2010. Agent Raschke conducted a preliminary analysis of the cell site records from LOPEZ's phones to determine the location of the cell towers LOPEZ's phones used during the kidnapping and ransom in this case.

39.     Phone records for **LOPEZ Phone 1** show that this phone was used at 8:15 a.m. on April 23, 2010, shortly before the time of the kidnapping. The cell tower used for this call is located in Cicero, Illinois, at approximately Cermak Street and Lombard Avenue. This is the same tower that Co-Conspirator B's phone used for the calls his phone made prior to the kidnapping, described in paragraph 34 above, and is the closest tower to the kidnapping location.

40.     As noted above, there was a ransom call made from the Cricket phone at approximately 12:59 p.m. on April 24, 2010, at the location where Minor A was being held. The cell tower used for that call was located at 805 W. 58th Street in Chicago, Illinois. Phone records for **LOPEZ Phone 2** show that this phone made a call to Co-Conspirator B at approximately 12:54 p.m., five minutes before the ransom call. The cell tower used for this call was located at approximately 59th Street and Francisco Avenue. This is one of the cell towers that Co-Conspirator B's phone used for calls during the time period 12:54 p.m. and 1:12 p.m., described in paragraphs 36 and 37 above.

41.     As part of his analysis, Agent Raschke also compared towers used by LOPEZ's phones with locations of pay phones used for ransom calls. Agent Raschke did this by using his training and experience to estimate a range around cell towers used by LOPEZ's phones to make or receive calls shortly before or after ransom calls. Agent Raschke determined this estimated range around the towers based on the proximity of the towers to other towers in the area. As detailed below, Agent Raschke was able to determine that three pay phones used to make ransom calls were within the range of cell towers LOPEZ's phones used to make or receive calls shortly before or after ransom calls.

42.     For example, there was a ransom call at approximately 2:26 p.m. from a pay phone located at 6332 W. Higgins Avenue in Chicago, Illinois. Records for **LOPEZ Phone 1** show that this phone received three calls from Co-Conspirator B's phone at approximately 2:27 p.m., 2:28 p.m., and 2:33 p.m. Agent Raschke's analysis determined that the pay phone from which the ransom call was made was within the estimated ranges of the cell towers used by LOPEZ's phone in receiving these calls.

43.     Similarly, there was a ransom call at 3:14 p.m. from a pay phone located at 3500 W. Fullerton in Chicago, Illinois. Records for **LOPEZ Phone 1** show that this phone received a call at approximately 3:31 p.m. Agent Raschke's analysis determined that the pay phone from which the ransom call was made was within the estimated range of the cell tower used by LOPEZ's phone for this call. In addition, phone records for **LOPEZ Phone 2** show that this phone made a call at approximately 3:43 p.m. Agent Raschke's

16

analysis determined that the pay phone used for the 3:14 p.m. ransom call was within the estimated range of the cell tower used by LOPEZ's for this call.

44.     In addition, there was a ransom call at 3:32 p.m. from a pay phone located at 3920 W. Diversey Avenue in Chicago, Illinois. Records for **LOPEZ Phone 1** show that this phone received a call at approximately 3:31 p.m. Agent Raschke's analysis determined that the pay phone from which the ransom call was made was within the estimated range of the cell tower used by LOPEZ's phone for this call.[6]

## SURVEILLANCE VIDEO

45.     One of the ransom calls was made from a pay phone located near a Citgo gas station at 5200 W. Addison Street, Chicago, Illinois. This ransom call was made at approximately 2:44 p.m. on April 24, 2010, and lasted for approximately two minutes and thirty seconds. FBI Special Agent Matthew Alcoke has reviewed surveillance video obtained from the Citgo gas station at 5200 W. Addison Street in Chicago, Illinois, for that approximate time period. Special Agent Alcoke observed Co-Conspirator A on April 24, 2010, when he and other FBI Agents interviewed Co-Conspirator A. According to Special Agent Alcoke, the surveillance video shows an individual matching Co-Conspirator A's physical description arriving at the Citgo gas station driving a red car with another unknown individual in the passenger seat. The individual matching Co-Conspirator A's description

---

[6] For the remaining calls, either the pay phones were not within the estimated range of cell towers that LOPEZ's phones used or there were not calls to or from LOPEZ's phone within a close enough time period of the ransom call.

can be seen exiting the car from the driver's seat, but then leaning back into the car for a brief moment, and then reentering the car. The car then pulled up to a gas pump, and the individual matching Co-Conspirator A's physical description exited the vehicle from the driver's seat and walked to a pay phone located in the parking lot, while the other unknown individual can be seen entering the gas station. The person matching Co-Conspirator A's physical description was at the pay phone from approximately 2:44 p.m. to 2:47 p.m. This is the approximate time and duration as a ransom call made from this location to Individual A. After the call, the individual matching Co-Conspirator A's description and the unknown individual can be seen driving away in the car.

46.     Co-Conspirator A was shown the surveillance video. Co-Conspirator A identified himself as the person driving the car and making the call from the pay phone. Co-Conspirator A confirmed that he made a ransom call to Individual A from the pay phone at this Citgo gas station. Co-Conspirator A also stated that LOPEZ was the individual with him in the car. Co-Conspirator A was shown a still photograph taken from the surveillance video which shows the passenger of the car after he had entered the gas station. Co-Conspirator A identified the individual in the still photograph as LOPEZ.

47.     On September 21, 2010, I interviewed two individuals, hereinafter referred to as Individuals C and D, who are the owners of the company where LOPEZ and Co-Conspirator A were previously employed. I showed these two individuals the

18

surveillance video noted in paragraph 45 above of the unknown individual who entered the Citgo gas station. Both individuals stated that the person in the still photograph is LOPEZ.

## IDENTIFICATION OF CAR USED DURING THE KIDNAPPING

48.     During an interview in October 2010, I asked Individual A and Minor A if they knew LOPEZ. Individual A said that he knew LOPEZ and that LOPEZ used to live in the basement apartment of a building owned by one of Individual A's brothers.

49.     Also during this interview, Minor A stated that about six weeks earlier, he saw a black Ford Expedition with chrome handles that resembled the car in which he was kidnapped. Minor A stated that he also recognized the individual who was driving the car. Minor A stated that he told his father, who also knew the individual but did not know his name. Individual A stated that he knew that the individual lived in a building that Individual A's brother owned in Cicero, Illinois. Individual A further stated that he knew that LOPEZ's wife and the owner of the car's wife were sisters. The FBI subsequently determined that the owner the car is Individual B, LOPEZ's brother-in-law, who is mentioned in paragraph 10 above.

50.     Individual A stated that he called Individual B and asked if he could come look at his car. Individual B agreed. As a result, Individual A and Minor A went to look at the black Ford Expedition. According to Minor A, the interior of this car had the same leather and tan seats and tan carpeting as the car in which he was kidnapped. Also,

Minor A stated that the speakers in this car were on each side of the front window frame, which was the same as the car in which he was kidnapped.

51.     I conducted an interview with Individual B on November 10, 2010. According to Individual B, LOPEZ borrowed his black Ford Expedition on approximately three occasions, but Individual B did not know the exact dates in which LOPEZ borrowed the car.

52.     I interviewed Individual B again on November 16, 2010. At that time, Individual B informed me that he recalled LOPEZ asking to borrow the car on April 22-23, 2010. Individual B stated that he remembered the dates based on his review of work records and conversations with his wife. According to Individual B, he left the keys to his car for LOPEZ inside Individual B's apartment on Thursday, April 22, 2010, before Individual B left for work. Individual B stated that he did not return home until 8:00 p.m. on April 23, 2010, at which time he saw LOPEZ in his garage with the car.

FURTHER AFFIANT SAYETH NOT.

NANETTE DOORLEY
Special Agent, Federal Bureau of Investigation

SUBSCRIBED AND SWORN to before me on June 14, 2011.

MICHAEL T. MASON
United States Magistrate Judge